## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 15 2016, 9:19 am

CLERK
of the supreme court,
court of appeals and
tax court

---

ATTORNEY FOR APPELLANT

Robert Owen Vegeler
Vegeler Law Office LLC
Fort Wayne, Indiana

APPELLEES PRO SE

Tye Doenges
Fort Wayne, Indiana

Kye Kellems
Fort Wayne, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

Ace Chester,

*Appellant-Plaintiff,*

v.

Kye Kellems, Tye Doenges, and Sky Chester,[1]

*Appellees-Defendants.*

March 15, 2016

Court of Appeals Case No.
02A03-1506-PL-740

Appeal from the
Allen Superior Court

The Honorable
Craig J. Bobay, Judge

Trial Court Cause No.
02D02-1406-PL-223

---

[1] Defendant Sky Chester received a directed verdict in her favor at trial, which Ace Chester does not appeal. However, we include her in the caption because, pursuant to Indiana Appellate Rule 17(A), a party in the trial court shall be a party on appeal.

**Kirsch, Judge.**

[1] Ace Chester ("Chester") filed suit against his three sisters to recover items of personal property alleged to be in the sisters' possession or destroyed by them, as well as to recover monetary damages. Following a bench trial, the trial court found in favor of Chester in part and in favor of the sisters in part. Chester appeals raising four issues that we consolidate and restate as: whether the trial court's decision was contrary to law.

[2] We affirm.

## Facts and Procedural History

[3] Chester has three sisters, Kye Kellems ("Kye"), Tye Doenges ("Tye"), and Sky Chester[2] ("Sky") (collectively, "the Sisters"). Their parents ("Father" and "Mother") owned two neighboring parcels of real property located in Allen County, Indiana: 6016 East Dupont Road ("the 6016 Property") and 6138 East Dupont Road ("the 6138 Property"). Prior to Father's death in 1992, Chester rented and lived in the residence on the 6016 Property for thirteen years, but upon Father's death, Chester moved in with Mother at her residence at the 6138 Property. In 2004, Mother transferred ownership of the 6016 Property to

---

[2] Sky at all times relevant to this action lived in Florida; Tye and Kye lived in Fort Wayne, Indiana.

Kye, and in 2006, Mother transferred ownership of the 6138 Property to Kye.[3] *Tr.* at 72-73, 81-82; *Chester Ex.* 18.

[4] The relationship between the parties can be described as contentious, at best. Over the years, law enforcement has been involved, as well as the courts; multiple protective orders and small claims actions have been filed, prior to Chester's complaint giving rise to this appeal.[4] The record before us reflects, among other things, that Kye filed a small claims action in November 2011 against Chester, alleging that he stole, sold, or otherwise disposed of personal property before their Mother's death in late December 2011. Chester was ordered in December 2011, via a protective order, to stay away from Kye's residence and place of employment for two years. *Appellees' Ex.* E. As part of Kye's small claims action, the court, in January 2012, issued an order stating that Chester had "seven days to vacate the premises" and was to take "only his items of personal property."[5] *Appellees' Ex.* F. In June 2012, the small claims court issued an order on Kye's complaint and found, "The Court is unable to

---

[3] The 6138 Property consisted of approximately three acres and a residence. A 1994 Last Will and Testament had provided that the three acres was devised to the Sisters and that Chester received a life estate in the home located on that property. *Chester Ex.* 5. Subsequently, in 2006, Mother quitclaimed the 6138 Property to Kye.

[4] The trial court in this case observed, "The police have been involved in disputes between the parties and this is at least the third time the parties have been involved in litigation against each other." *Appellant's App.* at 7.

[5] The Sisters state in their brief that they were "locked out" of the 6138 Property "from 11/1/2011 to 1/26/2012 when Sheriff of Allen County got there [and] had to help cut open door on 1/26/12." *Appellees' Br.* at 6.

distinguish what property was owned by whom" and "the Court cannot assess any damages to either party." *Appellees' Ex.* H.

[5] In June 2014, Chester filed a complaint against the Sisters, alleging, in part, that upon Mother's death, the Sisters "took, hid, disposed of, sold or otherwise unlawfully detained and kept possession of [Chester's] personal property set forth in Exhibit A[.]" *Appellant's App.* at 7.[6] The attached Exhibit A listed 497 items of personal property that he claimed the Sisters took, disposed of, or retained. He also claimed, "This action is brought in conjunction with I.C. § 34-11-2-7 for actions for damages for detention of personal property and for recovery of possession of personal property." *Id.* He stated that he attempted to recover the items of personal property on "numerous occasions" but the Sisters "refused" the attempts. *Id.* Chester also sought recovery of attorney's fees.

[6] The trial court held a bench trial in February 2015. At trial, Chester testified that he took care of their Mother, attending to her health needs, since the end of 2006, early 2007, until her death in December 2011. Chester presented at trial the list of the 497 items that had been attached to his complaint ("Exhibit 3"). He testified that it represented his property that he acquired "over thirty year's time." *Tr.* at 16. He compiled it "from [his] memory," later explaining that he

---

[6] A copy of the complaint is not included in the record before us. The trial court, in its judgment and order, cited to some of the allegations made by Chester in his complaint, and we rely on the trial court's recitation of those allegations. *Appellant's App.* at 7.

was able to do so from memory because "I'm the one who bought [the items] . . . or traded or swapped them." *Id*. at 17, 43. He testified that he purchased many of the items at auctions, antique shows, and garage sales, and others he swapped for services or acquired them through trade. He placed values on some or all of the items, explaining that his values were based on his experience, as well as using the figures he paid for them at the time of purchase at an estate sale or the like. Chester also submitted a separate exhibit, reflecting the "most important and likely the most valuable" items from the Exhibit 3 list ("Exhibit 16"). *Id*. at 29. Chester stated that, when he left the premises in January 2012, he took only three items of personal property. *Id*. at 35.

[7] In support of Chester's ownership of the 497 items and his valuations of them, Chester first called as a witness his friend Anthony Klemm, who throughout the years went with Chester to auctions, helped Chester "haul the stuff," and they made improvements to their homes together. *Id*. at 47. For the same reason, Chester also called Edward Schneider, who over the years attended antique shows and garages sales with Chester and bought and sold antiques and personal property. He testified to Chester's ownership of the items and that Chester's fair market valuations were reasonable and accurate. Chester's friend Ernest Nicole, who with Chester would go to garage sales and the like to barter, swap, and trade items, testified likewise. Chester's "very dear good friend" Jeannie Schlegel testified to her familiarity with the items and Chester's ownership of them. *Id*. at 60. Among other witnesses, Chester also called Kye.

[8]     Kye testified that there are some vehicles, built in the 1940s -1970s, sitting on the property, which belong to Chester, but other than those vehicles, the other items of personal property listed on Chester's Exhibit 3 are not at either the 6138 Property or the 6016 Property. She testified that, when she got possession of the 6138 Property in January 2012, "the house was pretty much empty," and "Chester had been removing items." *Id*. at 76. She noted, however, that she had no idea what was in the barn on the property, because it "has been falling down since 2001 . . . It is a dangerous place and I'm not going to try to crawl in there and figure out what is in there until I can have it taken down properly." *Id*. When questioned about specific items that Chester listed on his Exhibit 16, she testified that they were not on the premises. *Id*. at 77-79. However, as to two 1950s boats that Chester named in Exhibit 16, she testified that "those were estate boats," and an oval table on the Exhibit was also an estate item. *Id*. at 78-79. According to Kye, when, as part of Mother's estate auction, personnel came to assess and value estate items, "[Chester] had already removed . . . $55,000 worth of [estate] property." *Id*. at 82. Kye testified that she did not take or dispose of the 497 items listed on Chester's Exhibit 3. *Id*. at 85, 88. Contrary to Chester's claims that he cared for Mother, Kye testified that she cooked and fed Mother daily, bought supplies, and bathed her three times per week, and she presented two witnesses to testify to her care for Mother.

[9]     Also as part of their case-in-chief, the Sisters called, among others, Ronald Richardville, who since 1988 lived in a home across the road from the 6138 Property. He testified that the pole barn, which he had entered at some prior

time, began falling apart by 2000. He testified that the barn never had a door, only carpeting hanging over the door like a cover, but had since fallen down, and it has dirt floor. He testified that the Chevy Nova vehicles, appearing on Chester's Exhibits, had been in the barn since before 1988, and the 1972 pickup on the Exhibit list "is sitting beside the barn," as was a Ford wrecker listed on the Exhibits. *Id*. at 99. Richardville testified that the roof of the barn has totally fallen in and "is laying flat." *Id*. at 100. The Sisters presented photographs of some of the vehicles that Chester listed on his Exhibit 3, and as the trial court observed, the 1962 Chevy has "a tree growing on the back hood if it[.]" *Id*. at 112.

[10] In order to contradict Chester's claim that all 497 items listed on his Exhibit 3 were his personal property, the Sisters also presented old family photographs, which were admitted as evidence, to show that various items of personal property – which appeared on Chester's Exhibit 3 – had been in the family for decades and thus were not purchased or acquired by Chester, but were instead estate property. The Sisters conceded that Chester owned thirty-two of the 497 items found on his Exhibit 3, and the Sisters submitted a list identifying those thirty-two items ("Exhibit GG"), which included five vehicles that were either sitting on the property or in the barn. *Appellant's App*. at 116; *Tr*. at 134. As to the other items in Exhibit GG, Tye explained, "We might not know where they are or if they exist, but yes, they are not ours or the estate's." *Tr*. at 119.

[11] Chester called as a rebuttal witness, Jeannie Schlegel, who testified that she was present with Chester when he was ordered to leave the 6138 Property on

January 20, 2012, and that, contrary to the Sisters' claim, the house was not almost empty and was "fairly full of furniture," including items on Chester's Exhibit 3. *Id*. at 141.

[12] At the conclusion of all of the evidence, Sky moved for a directed verdict as to Chester's claims against her, asserting that there had been no evidence presented that she had any involvement or association with the disputed items of personal property, and the trial court granted her motion at that time. After taking the matter under advisement, the trial court, on May 26, 2015, issued its order and judgment. It determined that the thirty-two items found in Exhibit GG "are the personal property of [Chester]," but found that the values of those items was "so speculative and so uncertain" that the trial court did not grant a money judgment; rather, it ordered that Chester was to recover possession of those items. *Appellant's App*. at 9. With regard to all the other items on Chester's Exhibit 3 list, the trial court determined:

> [Chester] has failed to prove by a preponderance of the evidence that: those items of personal property still exist; that those items are in possession of Kye or Tye; that those items were ever in the possession of Kye or Tye; that [Chester] owned the items; and/or that those items actually have any value.

*Id*. Although the trial court determined that some items were Chester's, namely the thirty-two items identified in Exhibit GG, the trial court denied Chester's request for treble damages and attorney's fees, concluding that the actions of Kye and Tye did not rise to the level of conduct to merit such an award.

In June 2015, Chester filed a Motion for Relief from Order and Judgment, which the trial court denied in July 2015.  Chester filed a motion to reconsider, which, after a hearing, the trial court denied in August 2015.  The trial court ordered that Chester had "until September 12, 2015 to retrieve the personal items designated in the Court's 5/26/15 Order[.]"[7]  *Appellant's App*. at 4.  Chester now appeals.

## Discussion and Decision

On appeal, Chester asserts that at trial he established:  (1) he was the owner of the 497 items of tangible personal property; (2) the fair market value of each of the items; and (3) he did not receive possession of 494 of the 497 items, having removed only three of the items on the list.  He claims that, having proven the above, the trial court should have entered an order requiring all items be returned to him or requiring the Sisters to reimburse him for the fair market value of the missing items.

Although the trial court entered findings of fact and conclusions thereon, the record does not reflect a request for such findings by either party.  Where the trial court enters specific findings of fact and conclusions *sua sponte,* we apply the following two-tiered standard of review:  whether the evidence supports the findings, and whether the findings support the judgment.  *Fowler v. Perry*, 830

---

[7] The Sisters assert on appeal that "[Chester] received [the] items that he could establish [were his] and existed."  *Appellees' Br*. at 2.

N.E.2d 97, 102 (Ind. Ct. App. 2005). The trial court's findings and conclusions will be set aside only if they are clearly erroneous, *i.e.*, when the record contains no facts or inferences supporting them. *Id.* A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Id.* We neither reweigh the evidence nor assess the credibility of witnesses, but consider only the evidence most favorable to the judgment. *Id.* We observe that findings made *sua sponte* control only as to the issues they cover, and a general judgment will control as to the issues upon which there are no findings. *Id.* A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.*

[16]     Chester, having had the burden of proof at trial, appeals from a negative judgment and will prevail only if he establishes that the judgment is contrary to law. *Romanowski v. Giordano Mgmt. Grp., LLC*, 896 N.E.2d 558, 562 (Ind. Ct. App. 2008). A judgment is contrary to law when the evidence is without conflict and all reasonable inferences to be drawn from the evidence lead to only one conclusion, but the trial court reached a different conclusion. *Id.*

[17]     Having reviewed the record before us, we reject Chester's claim that he established ownership in the 494 items of personal property and their values. At trial, Chester testified that he acquired the items over the span of thirty years through purchase at auction, antique sales, or garage sales, or by the process of bartering, trading, or swapping. He assembled the detailed list of the items from memory and based the assigned values on his acquisition of the items, as well as his personal experience. He presented the testimony of various friends

to support his position on ownership and value. However, the Sisters presented testimony that some items on the list were not Chester's, but, instead, belonged to the estate. They also presented evidence that, during and after Chester's residence at the 6138 Property, he removed many items of personal property, including items that belonged to the estate. The Sisters testified that, other than five specified vehicles, the items of personal property were not located in either residence or on either property, were not there when Kye took possession of the 6138 Property in January 2012, and that they did not otherwise have possession of or dispose of the items. As far as value, the Sisters presented testimony that the vehicles had been outside or in a dilapidated barn for at least 10-15 years, and some had been exposed to the elements for decades. Thus, at best, the evidence is conflicting as to both ownership and value.

[18] Even assuming that, as Chester claims, he established ownership in and fair market value of the 494 items of personal property, he has not shown that he is entitled to relief. Although Chester testified that when he left the properties, he took nothing with him other than three specific items, Kye testified that the home was almost bare when she took possession of it in January 2012. She further testified that the Sisters did not retain or destroy the items. The record thus reflects conflicting evidence as to what happened to the 494 items. Indeed, Chester recognizes, "The testimony is contested . . . that [he] removed most of the items[.]" *Appellant's Br.* at 13.

[19] Given the evidence before it, the trial court determined that Chester owned the thirty-two items identified in Exhibit GG and ordered that he was entitled to

possession of those items; however, it denied his request for monetary damages, as any valuation was too speculative. As to the remainder of Chester's specified items of personal property, the trial court determined that Chester failed to meet his burden to establish that those items (1) still exist, or (2) are, or were ever, in the possession of Kye or Tye. Chester urges us to find that the trial court's decision was in error, but reduced to its essentials, Chester's claim on appeal is a request for us to reweigh the evidence, which we cannot do. *Fowler*, 830 N.E.2d at 102. Chester has not shown that the trial court's judgment and order, finding in favor of the Sisters, in part, and in his favor, in part, was contrary to law.

[20] Affirmed.

Crone, J., and Brown, J., concur.